UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                          :
DR. STEFANIE PERKINS,                     :          02 Civ. 6493 (RJH)
                                          :
                         Plaintiff,       :
                                          :          **MEMORANDUM
              -against-                   :          OPINION AND ORDER**
                                          :
MEMORIAL SLOANE-KETTERING CANCER          :
CENTER, WILLIAM BREITBART, M.D. and       :
ANDREW ROTH, M.D.,                        :
                         Defendants.      :
                                          :
-------------------------------------------------------------x
```

Dr. Stephanie Perkins brought this action against Memorial Sloane-Kettering Cancer Center (the "Center"), William Breitbart, M.D. ("Dr. Breitbart") and Andrew Roth, M.D. ("Dr. Roth") (collectively "defendants"), asserting claims of employment retaliation and retaliatory discharge in contravention of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §2000e *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* Specifically, Dr. Perkins asserts that defendants unlawfully retaliated against her by failing to hire her for an HIV study and then later discharging her in response to her alleged complaints of sex discrimination. Defendants now move for summary judgment on both claims contained in plaintiff's complaint and further move to strike certain submissions made by plaintiff in opposition to the motion for summary judgment. For the reasons set forth below, the Court grants defendants' motion for summary judgment in part and denies the motion in part. The Court also grants defendants' motion to strike in part and denies the motion in part.

**BACKGROUND**

I.    <u>Dr. Perkins' Employment at the Center</u>

Unless otherwise indicated, the following facts are undisputed.[1]

    A.    *Dr. Perkins Begins Her Employment at the Center*

Dr. Perkins first learned of a possible employment opportunity at the Center through her former graduate school classmates, Michael Kramer, Ph.D. ("Dr. Kramer") and Christopher Gibson, Ph.D. ("Dr. Gibson"), who were already working at the Center as Research Assistants.  (Perkins Dep. Tr. at 18-20; Gibson Aff. ¶ 7.)  Dr. Perkins applied for a position on two studies supervised by Dr. Roth regarding (1) the treatment of fatigue attendant with advanced prostate cancer (the "Fatigue Study"), which had not yet started; and (2) male anxiety associated with prostate cancer (the "Anxiety Study"), which was

---

[1] The facts as herein recited are drawn from defendants' Rule 56.1 Statement ("Defs.' 56.1 ¶ __"); plaintiff's Rule 56.1 Counterstatement of Material Facts ("Pl.'s 56.1 ¶ __"); Affidavit of Dawn J. Groman in support of defendants' motion for summary judgment ("Groman Decl. ¶ __") and attached exhibits; Transcript of deposition testimony of Dr. Stefanie Perkins attached as Exhibit 8 to Groman Aff. ("Perkins Dep. Tr. at __"); Transcript of deposition testimony of William Breitbart, attached as Exhibit 9 to Groman Aff. ("Breitbart Dep. Tr. at __"); Transcript of deposition testimony of Andrew Roth, attached as Exhibit 10 to Groman Aff. ("Roth Dep. Tr. at __"); Transcript of deposition testimony of Barry Rosenfeld, attached as Exhibit 11 to Groman Aff. ("Rosenfeld Dep. Tr. at __"); Transcript of deposition testimony of Linda Prager, attached as Exhibit 12 to Groman Aff. ("Prager Dep. Tr. at __"); Transcript of deposition testimony of Sheila Donoghue, attached as Exhibit 13 to Groman Aff. ("Donoghue Dep. Tr. at __"); Transcript of deposition testimony of Kylie Cotter, attached as Exhibit 14 to Groman Aff. ("Cotter Dep. Tr. at __"); Affidavit of Christopher Gibson, Ph.D. ("Gibson Aff. ¶ __"); Affidavit of Dr. Stefanie Perkins ("Perkins Aff. ¶ __"); Transcript of deposition testimony of Barry Rosenfeld attached as Exhibit 11 to Groman Decl. ("Rosenfeld Dep. Tr. at __"); Transcript of deposition testimony of Sheila Donoghue, attached as Exhibit 12 to Groman Aff. ("Donoghue Dep. Tr. at __"); Declaration of R. Elizabeth Urena ("Urena Decl. ¶ __") and attached exhibits.

ongoing.[2]  (*Id.* at 20.)  Dr. Roth subsequently hired Dr. Perkins as a Project Coordinator.  (Defs.' 56.1 ¶ 16.)

Dr. Perkins thus began her full-time employment at the Center on May 7, 2001 as a Project Coordinator in the Department of Psychiatry and Behavioral Sciences (the "Department").  (Perkins Dep. Tr. at 21; Defs.' 56.1 ¶ 8.)  As a new employee, Dr. Perkins was subject to the Center's six-month probationary period.  (Defs.' 56.1 ¶ 9.)  Dr. Perkins directly reported to Dr. Roth, although according to Dr. Perkins, Drs. Breitbart and Rosenfeld were also supervisors on the Anxiety Study.  (Perkins Dep. Tr. at 21-22.)  Dr. Roth had never supervised anyone else prior to hiring Dr. Perkins.  (Defs.' 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.)

Dr. Roth expected Dr. Perkins to "accrue" patients for the Anxiety Study—e.g., to meet with nurses who had a daily list of appointments for those patients coming in to be studied, to evaluate whether those patients were appropriate for the study, and to approach those patients to request their participation in the study.  (Roth Dep. Tr. at 17, 25-56; Defs.' 56.1 ¶¶ 26, 27; Pl.'s 56.1 ¶ 26.)  Dr. Perkins and Christopher Nelson, a Ph.D. student hired as a Research Assistant during the summer, were primarily responsible for accruing patients for the Anxiety Study, although Nelson recruited for the medicine side while Dr. Perkins recruited for the surgery side.  (Perkins Aff. ¶ 6.)  According to Dr. Perkins, she used the computer and other members of the staff, including nurses, to determine which patients would be eligible for the study.  (*Id.* ¶ 5.)

    B.    *Growing Difficulties Between Dr. Perkins and Dr. Roth From the Summer of 2001 to the Fall of 2001*

---

[2] Plaintiff also performed work on a third study regarding racial attitudes in prostate cancer screening.  (Perkins Dep. Tr. at 20.)

In the summer of 2001, Dr. Perkins began complaining to Dr. Roth that his management style involved too much oversight over her work, and that she wanted to work more independently. (Perkins Dep. Tr. at 29-30.) During their weekly meetings, Dr. Perkins repeatedly conveyed to Dr. Roth that she felt that his supervision was becoming "detrimental" to her work, insofar as he was engaged in "a lot of attention to detail, and a lot of oversight." (*Id*. at 32.) Dr. Roth explained that while he understood Dr. Perkins' concerns, he preferred to keep his management style and that he was worried about the upcoming Fatigue Study since it was his first major study supported by the National Institute of Health. (*Id*. at 31, 44; Defs. 56.1 ¶ 19.) According to Dr. Roth, he saw the Anxiety Study as a "transition phase into the fatigue study." (Roth Dep. Tr. at 16.)

Dr. Perkins was responsible for working on iterations of the research protocol necessary for the Fatigue Study to begin. (Defs.' 56.1 ¶ 32; Rosenfeld Dep. Tr. at 20.) Although Dr. Perkins was merely expected to make "modest" adjustments to a preexisting protocol which Drs. Breitbart and Rosenfeld had already prepared, she had failed to submit the protocol nearly two or three months later in August. (Defs.' 56.1 ¶ 33.)[3] Dr. Rosenfeld became concerned since the "clock [was] ticking" on the Fatigue study. (Rosenfeld Dep. Tr. at 22.)

In or about August of 2001, defendants realized that following Nelson's return to school, Nelson had accrued a significantly greater number of patients for the Anxiety Study than did Dr. Perkins. (Defs.' 56.1 ¶ 35.) Defendants felt that the Anxiety Study

---

[3] In her Counterstatement of Material Facts, plaintiff contests that she consistently handed in "drafts of the iterations for the research protocol for the *anxiety study* to Dr. Roth." (Pl.'s 56.1 ¶ 32 (emphasis added).) Plaintiff fails to dispute directly that she handed iterations for the Fatigue Study in a timely fashion.

was not progressing and that Dr. Perkins was doing minimal work on the study. (Rosenfeld Dep. Tr. at 15.) Dr. Perkins admitted that Dr. Roth expressed his concerns concerning her accrual rates from the summer. (Perkins Dep. Tr. at 144.)

During the summer and fall of 2001, Dr. Roth and Dr. Breitbart engaged in several discussions regarding Dr. Perkins' performance as a Project Coordinator. (Groman Aff., Ex. 19.) According to Dr. Breitbart, Dr. Roth recounted numerous issues such as Dr. Perkins' resistance to being accountable for her activities; recurrent lateness; vacations taken without prior approval from Dr. Roth; relative lack of productivity regarding patient accrual; limited enthusiasm or self-motivation; and repeated inaccessibility during the workday. (*Id.*)

In or about August of 2001, Dr. Roth also requisitioned a beeper for Dr. Perkins to carry. (Perkins Dep. Tr. 121-22.) The next month, Dr. Roth also asked Dr. Perkins to stop attending Wednesday morning research meetings that Dr. Breitbart conducted with his research group based on his perception that she was less productive. (Roth Dep. Tr. at 68.) Dr. Roth asked her to spend that time collecting data in the clinic. (Perkins Aff. ¶ 9.) According to Dr. Perkins, however, the Wednesday morning meetings were important for advancement to the extent that ongoing projects were discussed, troubleshooting took place and ideas for studies, seminars and papers were discussed. (Perkins Aff. ¶ 9.) Defendants assert that Dr. Roth encouraged her to attend the departmental meetings, which were separately held from the Wednesday meetings. (Groman Aff., Ex. 22.)

Dr. Perkins admitted that in October of 2001, Dr. Roth had mentioned that he thought she had been late to work a couple of times. (Perkins Dep. Tr. at 24-25.) Dr.

Roth again expressed concerns to Dr. Perkins regarding her performance issues including his inability to locate her in the clinic when she was expected to be there accruing patients and her absences at meetings where she was expected to appear. (Roth Dep. Tr. at 57-58; Groman Aff., Ex. 20; Perkins Dep. Tr. at 145-46.)

### C. Dr. Perkins' Meeting with Dr. Breitbart on October 25, 2001

On October 25, 2001, Dr. Perkins requested a meeting with Dr. Breitbart, during which they discussed numerous issues. (Perkins Dep. Tr. at 42; Groman Aff. Ex. 19.) Dr. Perkins told him that she felt that she was "being treated differently from the guys around there." (Perkins Dep. Tr. at 43.) Specifically, she felt that she was not "afforded a lot of independence or latitude" in setting work priorities, the flow of her schedule or working on manuscripts. (*Id*.) She further complained that Dr. Roth did not give her independence. (*Id*.) Dr. Breitbart explained to Dr. Perkins that Dr. Roth was understandably nervous about the Fatigue Study, and that several issues regarding her performance (e.g., lateness, inaccessibility during work, unexplained patient accrual rates) "created a situation where Dr. Roth had not established a sufficient sense of 'trust' in her ability to function more 'independently.'" (Groman Aff., Ex. 19.) Dr. Breitbart encouraged Dr. Perkins to "do all she could to establish this trust by diligently complying with Dr. Roth's structure for her supervision." (*Id*.)

Before the conclusion of the meeting, Dr. Perkins asked Dr. Breitbart whether he had any openings in his projects. (*Id*.) However, Dr. Breitbart told her that it would be "inappropriate" to switch her onto his projects in the middle of Dr. Roth's projects; moreover, he felt uncomfortable acting "behind Dr. Roth's back" since they had worked alongside each other for ten years. (*Id*.)

D.        *Dr. Perkins' Meeting with Drs. Breitbart and Roth on October 26, 2001*

On October 26, 2001, Dr. Perkins met with Drs. Breitbart and Roth for an hour in Dr. Roth's office.  (Perkins Dep. Tr. at 61.)  Although Dr. Perkins and Dr. Roth regularly met on a weekly basis, Dr. Breitbart had joined this meeting at Dr. Roth's request.  (*Id*. at 61-62; Roth Dep. Tr. at 80.)  At this meeting, they discussed Dr. Perkins' dissatisfaction with Dr. Roth's insistence on close supervision.  (Groman Aff., Ex. 19.)  Dr. Roth said that he understood her concerns but nevertheless wanted to have closer communications because he was concerned about how quickly the accrual was progressing for the Anxiety Study.  (Perkins Dep. Tr. at 63-64.)  Dr. Roth expressed his desire to finish the Anxiety Study before the Fatigue Study started.  (*Id*. at 65.)

Drs. Perkins, Roth and Breitbart also discussed her perceived poor performance in accruing patients, although Dr. Perkins insisted that she had a lower refusal rate than other research assistants.  (*Id*.)  The three discussed the role of Noelle Wooten, another nurse at the Center, in terms of assisting the accrual process by looking through patient charts.  (*Id*.)  According to Dr. Perkins, Dr. Breitbart remarked that "it's important; [patients] like talking to attractive women, it's going to be important for them to talk to attractive women like you and Noelle."  (*Id.* at 66.)  Dr. Breitbart allegedly started laughing and turned to Dr. Roth, suggesting that "we could even send Noelle on some home visits … she could bring her stethoscope."  (*Id*.)  Dr. Perkins claims that Dr. Breitbart made a "lewd face" and was laughing "quite hard" despite her obvious embarrassment.  (*Id*.)

Finally, the last major issue discussed during the October 26, 2001 meeting was Dr. Perkins' inaccessibility during work hours.  (Defs.' 56.1 ¶ 53.)  Plaintiff admits that

Dr. Roth mentioned his inability to reach her despite paging her. (Perkins Dep. Tr. at 65.) Plaintiff further acknowledges that she held outside work when she worked at the Center and was therefore unavailable at certain times, but insists that Drs. Breitbart and Roth were aware of her outside employment. (Perkins Dep. Tr. at 26, 27, 55.) Drs. Breitbart and Roth nevertheless found some of Dr. Perkins' explanations for where she was during work hours to be contrived. (Groman Aff., Exs. 19 and 23.) They acknowledged, however, that Dr. Perkins had completed significant tasks and performed well, including writing several drafts of the IRB protocol and setting up a database. (Groman Aff., Ex. 19.)

At the close of the meeting, Dr. Roth told Dr. Perkins that the probationary period was ending soon and that her performance needed to improve. (Roth Dep. Tr. at 89.) Although they agreed on more daily communication to keep Dr. Roth updated as to her progress, Dr. Perkins asked Dr. Roth for a date on which the increased scrutiny would decrease or otherwise change. (Groman Aff., Ex. 23.) Dr. Roth responded that he would give her a date shortly thereafter. (*Id.*)

Around this time, however, Dr. Roth still considered terminating Dr. Perkins since her probationary employment was about to end on November 7, 2001. (Defs.' 56.1 ¶ 44.) He felt that she was "not taking primary responsibility" for the Anxiety Study. (Roth Dep. Tr. at 92.) Dr. Roth discussed the possibility of terminating Dr. Perkins or extending her probationary period with several supervisors in the Department, including Shawanda Patterson, Research Administrator, and Dr. Jamie Ostroff, Director of Research. (Defs.' 56.1 ¶ 45; Roth Dep. Tr. at 58.) Despite their recommendations to fire Dr. Perkins, Dr. Roth felt "ambivalent." While he felt that some of her work was

satisfactory, he wanted continuity in the projects and hoped to help her improve her performance. (Roth Dep. Tr. at 94.) As such, Dr. Roth decided to follow Dr. Breitbart's advice in not terminating Dr. Perkins' employment at that time. (Defs.' 56.1 ¶ 58.)

E.     The HIV Study

On November 20, 2001, Dr. Perkins overheard Dr. Gibson having a phone conversation with a male friend, during which Dr. Gibson mentioned that he was leaving his position as the Project Coordinator on an HIV study and encouraged his friend to apply. (Perkins Dep. Tr. at 77.) As early as October 7, 2001, Dr. Breitbart had asked Dr. Gibson to find a "lower level" replacement on the HIV study, because he wanted Dr. Gibson to become the Project Coordinator on a new study. (Defs.' 56.1 ¶¶ 61, 63; Gibson Aff. ¶ 10.) Immediately after the conversation ended, Dr. Perkins approached Dr. Gibson and asked why she had not been considered or consulted for the position. (*Id*. ¶ 13.) She complained that she was not being treated fairly at the Center because of sex discrimination. (Perkins Dep. Tr. at 78.) After Dr. Perkins told him about Dr. Breitbart's alleged comments at the October 26, 2001 meeting, Dr. Gibson allegedly agreed with her view and said, "[Y]ou've been shafted here and it is discrimination and Dr. Breitbart is sexist," a statement which Dr. Gibson disputes he made. (*Id*. at 79; Gibson Aff. ¶ 23.)

Dr. Perkins asked Dr. Gibson to tell Dr. Breitbart that she was interested in working on the HIV study, and that his alleged comments at the October 26, 2001 meeting were inappropriate. (Gibson Aff. ¶ 15; Perkins Dep. Tr. at 76.) When asked why she would want to work for Dr. Breitbart in light of those comments, Dr. Perkins stated that she "[w]ould forgive him if she could work with him on the HIV Study." (Gibson Aff. ¶ 16.) Moreover, Dr. Gibson asked Dr. Perkins whether she thought that

Dr. Breitbart should become aware of her feelings, to which Dr. Perkins answered that maybe he should know.  (Defs.' 56.1 ¶ 66; Pl.'s 56.1 ¶ 66.)  Dr. Gibson told Dr. Perkins that he would call her later that day after meeting with Dr. Breitbart.  (Id. ¶ 17; Perkins Dep. Tr. at 80.)

The parties agree that Dr. Gibson conveyed Dr. Perkins' interest in the HIV Study to Dr. Breitbart.  (Gibson Aff. ¶ 20.)  Plaintiff alleges that Dr. Gibson told her that he advised Dr. Breitbart of her thoughts regarding the October 26, 2001 meeting.  (Pl.'s 56.1 ¶ 70.)  According to plaintiff, Dr. Gibson told her that Dr. Breitbart became "unglued" and "lost it" after he advised him of Dr. Perkins' complaints.  (*Id*.)  According to defendants, Dr. Gibson merely told Dr. Breitbart that Dr. Perkins "appeared upset about something" but did not elaborate on Dr. Perkins' sentiments regarding Dr. Breitbart's alleged comments.  (Defs.' 56.1 ¶ 70.)  Dr. Gibson claims that he "lied" when he told Dr. Perkins that he had relayed her belief that Dr. Breitbart had made inappropriate comments or the substance of those comments.  (*Id*. ¶ 72.)

Following his discussion with Dr. Gibson, Dr. Breitbart e-mailed Dr. Perkins at 3:49 p.m., encouraging her to apply for the HIV Study while stating that he thought that the possibility of moving to his study had become a "non-issue" after the October 26, 2001 meeting.  (Groman Aff., Ex. 19.)  Dr. Breitbart suggested that she e-mail him her resume and consider discussing the situation with Dr. Roth.  (*Id*.)

On November 21, 2001, Drs. Breitbart, Roth and Rosenfeld met to discuss Dr. Perkins' expressed interest in the HIV study.  (Groman Aff., Ex. 19.)  Despite Dr. Roth's difficulties with Dr. Perkins at that point, Drs. Breitbart and Rosenfeld decided to give Dr. Perkins full consideration for the position.  (*Id*., Exs. 19 and 20.)  Dr. Roth testified

that he felt "kind of surprised" that Dr. Perkins wanted to give up her position on his

study to apply for the position on Dr. Breitbart's HIV Study without having consulted

him first.  (Roth Dep. Tr. at 129.)  He felt "upset" and regretted not firing her prior to the

end of the probationary period.  (*Id*. at 130.)  Later that morning, Dr. Breitbart

nevertheless sent Dr. Perkins an e-mail, advising her that he thought it "would be helpful

if you and I, and Andy, and Barry met together to discuss your interests on Wednesday at

10am in my office."  (Groman Aff., Ex. 19.)

> F.    *Dr. Perkins' Meeting with Drs. Breitbart, Roth and Rosenfeld on*
> *November 28, 2001*

On November 28, 2001, Dr. Perkins met with Drs. Breitbart, Roth and Rosenfeld.

(Defs.' 56.1 ¶ 77; Pl.'s 56.1 ¶ 77.)  The meeting started with a discussion of Dr. Perkins'

application for the position on the HIV Study.  (Perkins Dep. Tr. at 103.)  Dr. Perkins

handed out copies of her curriculum vitae and cover letter to everyone, stating that she

had an interest in pursuing HIV in her career, expertise in the area and some familiarity

with the study and its staff.  (*Id*. at 103, 116.)  However, Drs. Breitbart and Rosenfeld

told her "that the position was no longer available, and that, in fact, it was a lower level

position."  (*Id*. at 117.)  When Dr. Perkins asked when the decision to change the position

had been made, they responded "two days before," to which she responded "I don't

understand."  (*Id*.)   Dr. Perkins described Dr. Breitbart's reaction as follows:

> Dr. Breitbart's face started turning red.  His voice got very angry and was
> shaking.  He was leaning back in his chair with his arms up, hands clasped behind
> his head and his elbows out, and said in an angry voice that was louder than
> before, I get the sense you feel that you've been wronged somehow.  You know,
> if you don't like it here, maybe you should quit.

(*Id*.)  Dr. Rosenfeld then allegedly "mov[ed] his hand up and down in a motion.  He was

saying to the effect of wait here, hold on here."  (*Id*.)  Dr. Perkins further alleges that Dr.

Breitbart then stated in a softer voice, "[W]hy would anyone want to work with you anyway? He said I was antagonistic. He said I had a bad attitude." (*Id*.) Dr. Perkins then stated that she just "want[ed] the same opportunities as everybody else." (*Id*.) Dr. Breitbart allegedly responded, in a sarcastic tone, "Uh-huh, uh-huh, is that right." (*Id*.) According to Dr. Perkins, when she repeated the reasons why she'd be good in the position and said "that's my position on it," Dr. Breitbart said, "[O]h, is that your legal position?" (*Id*.) Moreover, Dr. Perkins asserts that Dr. Roth was leaning forward with his "face in his hands." (*Id*.) Later, Dr. Breitbart allegedly apologized for becoming angry. (*Id*. at 119.)

According to defendants, Drs. Breitbart and Rosenfeld explained to Dr. Perkins that "we were not seeking to replace Dr. Gibson with another Project Coordinator" since "Dr. Kramer was already a co-Project Coordinator and would assume the role of sole Project Coordinator on the HIV study." (Groman Aff., Ex. 19.) Defendants maintain that they were seeking to hire a Research Assistant whose primary function would be the conduction of clinical interviews and data entry, and not supervision. (*Id*.) Defendants understood Dr. Perkins' reaction as an "intimation that we were not being honest with her." (*Id*.) Dr. Rosenfeld stated that he thought Dr. Perkins became "confrontational and defensive" in the tone of her responses during the conversation. (Rosenfeld Dep. Tr. at 51.) As a result, Dr. Breitbart became "increasingly animated." (*Id*.) Dr. Breitbart admits that he asked Dr. Perkins "why she felt we should hire her for our study, given the fact that her performance on Dr. Roth's project was not particularly exemplary." (*Id*.) Dr. Breitbart further expressed doubts about Dr. Perkins' commitment to projects considering that "she had only been employed by Dr. Roth for 6 months, despite being

very enthusiastic regarding the project when interviewed, and now wanted to leave." (*Id.*)

At the close of the meeting, Drs. Breitbart and Roth asked Dr. Perkins whether she was still interested in the Research Assistant position on the HIV study, to which she responded that she "needed some more time to decide." (Defs.' 56.1 ¶ 80; Pl.'s 56.1 ¶ 80.) On December 4, 2001, Dr. Breitbart subsequently learned that Dr. Perkins had independently sought out Dr. Rosenfeld regarding more details about the HIV Study. (Groman Aff., Ex. 18.) On December 5, 2001, Drs. Breitbart and Rosenfeld met to discuss the possibility of Dr. Perkins' request to be considered for the position on the HIV Study. (*Id.* ¶ 85.) They concluded that while she was adequately qualified, they did not want to have another Project Coordinator on the HIV Study, and that they did not have a "good impression" of Dr. Perkins' collegiality, enthusiasm, sense of responsibility or performance. (Groman Aff., Ex. 19.) Dr. Breitbart thus sent Dr. Perkins a letter dated December 5, 2001, apprising her that they had decided against offering her a position on the HIV Study. (*Id.*, Ex. 32.) Instead, Drs. Breitbart and Rosenfeld hired Alexis Tamarkin, a woman who had applied for the Research Assistant position around the same time that Dr. Perkins had applied at a salary of $32,500. (Defs.' 56.1 ¶ 93.)

> G.     *Dr. Roth's Attempts to Schedule the Yearly Performance Appraisal*
>         *Meeting with Dr. Perkins*

On or about December 6, 2001, Dr. Roth sent Dr. Perkins an e-mail at 2:47 p.m. asking her to meet the next day to "schedule an appointment for sometime next week to review your yearly evaluation." (Groman Aff., Ex. 35.) The performance evaluation assessed Dr. Perkins as "Below Expectations" with respect to Quality Assurance, commenting that "[t]here have been several times when Dr. Perkins was not up to date on

data accrual." (*Id.*, Ex. 34.) The performance evaluation further assessed her capabilities with respect to data collection, data entry, data reporting/analysis and compliance as "Meets Expectations," albeit with comments such as "Dr. Perkins needs to make arrangements for f/u on all questionnaires distributed in clinic," "[a]t times does not seem updated on number of subjects accrued to study" and "[s]he has not always followed up on missing questionnaires. When concerned about confidentiality issues with consent signing, she was not satisfied with administrative rulings of our compliance with regulations." (*Id.*) Dr. Roth characterized Dr. Perkins' work with respect to her research project administrative liaison work, professional development, communication, availability and care for the environment as "Meets Expectations," commenting that "Dr. Perkins has done good work researching and working on the new protocol. She does timely work on protocol development. She once refused to attend a brainstorming session about the use of a database because she wanted to attend a lecture about career choices instead." (*Id.*) With respect to operations management, Dr. Roth found her performance "Unacceptable," noting that:

> Dr. Perkins has received counseling and feedback about the need to provide daily reports. She has not supplied daily interval reports on a consistent basis as requested 10/01. She has not consistently followed suggestions for meeting with clinic nursing staff to facilitate patient accrual. Dr. Perkins has not always been in clinic at expected times. We realized recently her beeper does not reach 53rd street. However, when I pointed out to her to get it fixed/checked, it took her more than two months to correct the problem. Since there has been issues [sic] with her pager, Dr. Perkins needs to consistently check her voicemail and e-mail at least 2 times per day … and respond in a timely manner.

(*Id.*) Dr. Roth also evaluated Dr. Perkins' teamwork as "Below Expectations," commenting that "Dr. Perkins has had disagreements about attending DMS training, which is required for her position. Dr. Perkins had concerns about office space allocation

but chose to communicate these concerns to other staff creating discourse [sic] through the service." (*Id.*) Ultimately, Dr. Roth gave her an overall assessment of "Unacceptable," stating that Dr. Perkins "needs to work on using appropriate channels of communication and improving her teamwork and timeliness of work. She needs to improve her management skills of the RSA assigned to her project. Dr. Perkins needs to show immediate and consistent compliance to the duties, projects, and meetings that her supervisor instructs her to do or to attend." (*Id.*)

On December 7, 2001, Dr. Roth sent Fain and Patterson an e-mail informing them that he had met with Dr. Perkins and scheduled the meeting for December 13, 2001 at 2:00 p.m. (Defs.' 56.1 ¶ 96; Groman Aff., Ex. 36.) After being informed by Dr. Roth that Patterson would attend the meeting as well, Dr. Perkins immediately felt "singled out" in the Department by having two supervisors evaluate her. (Groman Aff., Ex. 36.) Although Dr. Perkins agreed to meeting with Dr. Roth on December 13, 2001 to discuss her yearly performance appraisal, she expressed her concern about "meeting with a bunch of supervisors in a room." (Perkins Dep. Tr. at 124; Pl.'s 56.1 ¶ 98.) Dr. Perkins asserts that when she asked Dr. Roth if they could meet alone, Dr. Roth acquiesced. (Perkins Dep. Tr. at 124.)

On December 11, 2001 at approximately 2:52 p.m., Dr. Perkins e-mailed Dr. Jimmie Holland, who was acting as Chairman of the Department at the time, to request a meeting to discuss "some matters related to my work here that I believe are important." (Groman Aff., Ex. 38.) Dr. Perkins further requested that Dr. Holland meet with her during the following week. (*Id.*) At approximately 2:54 p.m., Dr. Perkins cancelled the performance appraisal meeting through Dr. Roth's secretary. (Groman Aff., Ex. 37.) Dr.

Perkins never contacted Dr. Roth directly to explain why she did not want to attend the meeting. (Perkins Dep. Tr. at 135.) Later that day at approximately 5:38 p.m., Dr. Roth e-mailed Dr. Perkins, explaining that the performance appraisal form had to be submitted by December 14, 2001. (Groman Aff., Ex. 37.) He further wrote:

> If you cannot find time in your schedule to meet with me then I believe I will have to submit this form without the benefit of discussing it with you, or your feedback. This is something I do not want to do. Please explain to me why you cannot meet with me on Thursday at the time we agreed. Please make every effort to meet with me and Shawanda to discuss your evaluation. Perhaps Darnele [Dr. Roth's secretary] can help finding a better time.

(*Id*.) However, Dr. Perkins did not follow up on rescheduling the appraisal. (Urena Decl., Ex. B.) Moreover, Dr. Perkins never met with Dr. Roth to review her performance appraisal. (Defs.' 56.1 ¶ 99.)[4] That same day at approximately 6:38 p.m., Dr. Holland replied to Dr. Perkins by e-mail, suggesting that they meet together with Dr. Roth on the following Monday or Tuesday. (Groman Aff., Ex. 38.) Dr. Holland planned to meet with Drs. Roth and Perkins on December 18, 2001 at 4:00 p.m., although it unclear when or how this meeting was scheduled. (Urena Decl., Ex. D.)

###### H. Dr. Perkins' Meeting with Sheila Donoghue on December 13, 2001

After she received the e-mail from Dr. Holland, Dr. Perkins requested a meeting with Sheila Donoghue, Senior Employee Relations Specialist, who met with her on December 13, 2001. (Perkins Dep. Tr. at 153.) During that meeting, Dr. Perkins told Donoghue that she "felt that I was being treated differently than the men and there was discrimination there." (*Id*.) Dr. Perkins disclosed the "sexually inappropriate comments

---

[4] Plaintiff asserts that she met with Dr. Roth regarding the performance appraisal on November 7, 2001. (Pl.'s 56.1 ¶ 99.) However, plaintiff's citation to the record merely reflects that they discussed when they would meet to go over the performance appraisal. (Perkins Dep. Tr. at 123-24.)

that Dr. Breitbart" to Donoghue, further adding that she "wanted to be able to go into work with the knowledge that I wasn't going to be yelled at, and that it was a professional environment." (*Id*.) Dr. Perkins also asserts that when she requested an ombudsman at the meeting with Dr. Holland, Donoghue said it would not be a good idea. (*Id*. at 153-54.) Dr. Perkins asked Donoghue if "somebody should talk to Dr. Holland about meeting with me alone because of the nature of what I wanted to discuss with her." (*Id*. at 154.) Dr. Perkins alleges that she told Donoghue that she was "concerned about the upcoming evaluation" because she "didn't know whether there would be bias in the evaluation because I was already being retaliated against and I had been yelled at and humiliated." (*Id*.) When Dr. Perkins asked Donoghue what she should do, Donoghue allegedly stated:

> [W]ell, go ahead, don't have the evaluation meeting, have the meeting with Dr. Holland as you've already begun to set up here. And she said not have to the evaluation meeting and that having an evaluation with somebody who was one of the people who you were complaining about wasn't the best way to go about doing it. So therefore, to make sure, go ahead and meet with Dr. Holland.

(*Id*.)

Donoghue did not directly address whether not she told Dr. Perkins not to attend the yearly performance appraisal meeting with Dr. Roth. Indeed, at the time of her meeting with Dr. Perkins, it appears that no yearly performance appraisal meeting had been scheduled. Donoghue testified that:

> [I] didn't understand the relationship with [Dr. Perkins'] meeting with Dr. Holland and then things somewhat began to fall in place…. I told her that I thought she should agree to meet with Dr. Roth and Dr. Holland.

(Donoghue Dep. Tr. at 43-44.) Donoghue told Dr. Perkins to explain to Dr. Holland why she was uncomfortable with having Dr. Roth there. (*Id*. at 36.) In the event that Dr. Holland wanted Dr. Roth to be present, Donoghue advised Dr. Perkins to "lay down the

rules for discussion." (*Id*.) Donoghue allegedly advised Dr. Perkins to tell Dr. Holland about Dr. Breitbart's comments. (Perkins Dep. Tr. at 155.) Moreover, Dr. Perkins claims that she asked Donoghue about the formal process for filing a complaint. (*Id*. at 155-56.) Donoghue and Dr. Perkins agreed to talk after her meeting with Dr. Holland and discuss how Donoghue would further approach the matter. (Donoghue Dep. Tr. at 36.) Following this discussion, Donoghue disclosed at the weekly staff meeting that she was working on a "possible sexual harassment" situation, without giving further details. (*Id.* at 48, 51-52.)

### I. Dr. Perkins Misses the December 18, 2001 Meeting with Dr. Roth

On December 17, 2001, Dr. Roth notified Dr. Perkins by e-mail at approximately 2:12 p.m. that he had received an extension in preparing her performance appraisal and that she was directed to appear for a mandatory meeting the following morning, December 18, 2001, at 9:30 a.m. (Perkins Dep. Tr. at 156.) Dr. Roth's e-mail informed Dr. Perkins that if she failed to attend, the Center would "take appropriate next steps, including disciplinary action." (Defs.' 56.1 ¶ 111; Pl.'s 56.1 ¶ 111.) At approximately 2:59 p.m. the same day, Dr. Perkins replied by e-mail, stating that she was unable to attend the meeting and that her "follow-up concerning this issue is included in my arranging a meeting with Dr. Holland, which I initiated last week." (Groman Aff., Ex. 39.) Dr. Roth forwarded Dr. Perkins' response to Kylie Cotter, the Administrator for the Department who served as a liaison between the Department and Employee Relations (Defs.' 56.1 ¶¶ 107-08), who had been engaging with several conversations with Linda Prager, Director of Employee Relations and Organizational Development. (Prager Dep.

Tr. at 42; Urena Aff., Ex. B.)  Prager informed Cotter that Dr. Perkins could be terminated for job abandonment and insubordination if she did not attend the meeting with Dr. Roth.  (Defs.' 56.1 ¶ 114.)

On December 18, 2001, Dr. Perkins did not appear for the 9:30 a.m. meeting scheduled with Dr. Roth.  (*Id*. ¶ 116.)  Although Cotter called and paged Dr. Perkins to no avail, Dr. Perkins responds that defendants knew that she had turned in her short-range beeper which did not work at any of the Center's locations and was waiting for a long-range beeper.  (Defs.' 56.1 ¶ 117; Pl.'s ¶ 117.)  Cotter called Dr. Perkins' cubicle, her office line and the clinics where she was supposed to recruit patients, but could not reach her.  (Cotter Dep. Tr. at 73.)  Shelly Franklin, the secretary at the 59th street location, allegedly searched the area to see if Dr. Perkins was present.  (*Id*. at 74.)  According to defendants, Dr. Perkins did not appear at work until 12:40 p.m.  (Defs.' 56.1 ¶ 119.)  Dr. Perkins maintains, however, that she arrived to work shortly after 9:00 a.m. to work on an assignment that Dr. Roth had asked her to perform prior to December 18, 2001.  (Perkins Aff. ¶ 12.)  That morning, Dr. Roth had sent her a follow-up e-mail regarding this task, such that Dr. Perkins allegedly was at various spots from her workstation to a shared office space to being outside prior to e-mailing him the results.  (*Id*.)

*J.    The Termination Decision on December 18, 2001*

Sometime after 12:40 p.m., Dr. Roth made the decision to terminate Dr. Perkins after Cotter and Prager informed him that Dr. Perkins' failure to appear for the evaluation meeting, job abandonment and insubordination were grounds for dismissal.  (Roth Dep. Tr. at 173-74; Cotter Dep. Tr. at 86.)  According to defendants, Dr. Roth did not know about Dr. Perkins' complaint or why she planned to meet with Dr. Holland prior to

making the termination decision. (Roth Dep. Tr. at 173-74). Cotter and Dr. Roth decided to use Dr. Perkins' scheduled meeting with Dr. Holland to inform Dr. Perkins of their termination decision. (Defs.' 56.1 ¶ 122.) Cotter prepared a termination decision form prior to the meeting explaining that Dr. Perkins was being dismissed "because of job abandonment and insubordination." (Groman Aff., Ex. 40.)

Dr. Perkins arrived at Dr. Holland's office for the 4:00 p.m. meeting. (Perkins Aff. ¶ 13.) Dr. Holland's secretary told her that Dr. Holland was with a patient but would become available shortly thereafter. (*Id*.) Cotter, Kathy Fain (the Department's Research Manager) and Dr. Roth found Dr. Perkins outside Dr. Holland's office and informed her that she would be meeting with them instead of with Dr. Holland. (Def.' 56.1 ¶ 124.) Although Dr. Perkins insisted on meeting with Dr. Holland or his secretary and kept searching for them (Perkins Dep. Tr. at 165-66), Cotter, Fain and Dr. Roth kept following her and expressed their desire to meet at that moment. (*Id*. at 166; Urena Decl., Ex. D.) Ultimately, Dr. Roth told Dr. Perkins "in the middle of this open public area with cubicles and offices lining and open … ['] you're terminated.[']" (Perkins Dep. Tr. at 166; Perkins Aff. ¶ 16.)

Dr. Perkins called Donoghue and informed her that she had been terminated. (*Id*.) Donoghue had no prior knowledge of the termination decision and played no role in the decision. (Defs.' 56.1 ¶ 127; Pl.'s 56.1 ¶ 127.) When Donoghue spoke with Prager, they realized that they had each been involved in different situations relating to Dr. Perkins. (Defs.' 56.1 ¶ 128.) Specifically, Donoghue had been dealing with Dr. Perkins' sex discrimination complaint, while Prager had been involved in Dr. Perkins' failure to report for her appraisal and the termination decision. (*Id*.) For the first time, Donoghue

informed Prager that Dr. Perkins had made a complaint to Employee Relations. (*Id.* ¶ 129.)

Prager thus decided to change Dr. Perkins' termination to a suspension without pay while the Center investigated her complaint. (*Id.* ¶ 130.) Prager relayed this decision to Janice Levy, the Vice President of Hospital Administration, who then conveyed the message to Cotter. (*Id.* ¶ 131; Urena Decl., Ex. D.) Prior to this time, Cotter was unaware of Dr. Perkins' complaint. (Defs.' 56.1 ¶ 133.) Levy advised Cotter to suspend Dr. Perkins without pay in the event that Dr. Perkins mentioned the complaint. (*Id.*)

Cotter subsequently asked Dr. Perkins if she preferred to speak in private, an opportunity at which she "jumped." (*Id.*) According to Cotter, Dr. Perkins kept "alluding to the 'timing'" of when Employee Relations began receiving negative feedback regarding her performance. (*Id.*) Dr. Perkins told Cotter about her discussion with Donoghue. (Perkins Aff. ¶ 17.) According to Dr. Perkins, Cotter said that the fact that Dr. Perkins had failed to attend the evaluation meeting played a role in her termination. (*Id.*) Cotter asked for Dr. Perkins' keys, identification badge and pager, but Dr. Perkins refused to give them back. (Urena Decl., Ex. D.)

Consequently, Prager investigated Dr. Perkins' allegations by meeting with Drs. Breitbart, Roth, Rosenfeld, Kramer and Gibson. (Prager Dep. Tr. at 38.) Following that investigation, Prager concluded that Dr. Perkins' allegations were unsubstantiated. (*Id.* at 43.) On January 16, 2002, Prager informed Dr. Perkins that the Center had discerned no evidence to support her allegations. (Groman Aff., Ex. 43.) Prager further told Dr. Perkins that her termination was reinstated with an effective date of December 18, 2001 (the date on which she was originally informed about the termination decision). (*Id.*)

II.     Dr. Perkins' Legal Remedies

On or about August 13, 2002, plaintiff served and filed her initial complaint alleging claims of disparate treatment based on sex, refusal to hire based on sex, and retaliation pursuant to Title VII, New York State Human Rights Law and New York City Human Rights Law.  (Groman Aff., Ex. 1.)  Plaintiff subsequently (1) filed an amended complaint retaining the employment retaliation claims regarding the HIV Study and her ultimate discharge on May 20, 2003; and (2) withdrew her disparate treatment and refusal-to-hire claims against defendants contained in the original complaint with prejudice by stipulation dated June 2, 2003.  (*Id*., Exs. 3 and 4.)  On July 30, 2003, defendants served and filed their amended answer.  (*Id*., Ex. 5.)

After subpoenaing employment records from the Research Foundation for Mental Hygiene, Inc. (the "Research Foundation"), defendants determined that plaintiff had been simultaneously employed by the Center and the Research Foundation.  On October 17, 2003, defendants moved to dismiss the complaint and for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.  The Court denied the motion to dismiss without prejudice by unpublished order dated May 13, 2004.  Defendants subsequently renewed their motion to dismiss on July 9, 2004, which the Court denied on the record during oral argument on March 17, 2005.

**DISCUSSION**

I.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir. 1997) (quoting Fed. R. Civ. P. 56(c)). Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986); *Distasio v. Perkin Elmer Corp*., 157 F.3d 55, 61 (2d Cir. 1998) (summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case.")

In order to defeat a defendant's properly supported motion for summary judgment, a plaintiff in an employment discrimination action must show that there is a material issue of fact as to whether the employee's protected status was a motivating factor in the adverse employment action. *See Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir. 1995) (plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the "motivating" factors). Because employment discrimination actions often present factual issues as to the presence or absence of discriminatory intent that are not appropriately resolved at the summary judgment stage, courts must exercise caution in such cases and grant this remedy only when the employer has proffered evidence of a legitimate, nondiscriminatory reason for its action which raises "no genuine issue and which no rational trier of fact could reject." *Id.* at 203.

In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all

reasonable inferences" in its favor.  *Am. Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Nevertheless, an alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson,* 477 U.S. at 247–48 (emphasis in original).  "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 248).  "A fact is 'material' if it might affect the outcome of the suit under governing law."  *Id.* (quoting *Anderson*, 477 U.S. at 248).

To survive summary judgment, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 256-57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002). Where, as here, the party primarily relies on his own statements asserted in his opposition memorandum, such statements must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).  Moreover, hearsay statements that would be inadmissible at trial, conclusory assertions, and mere denials contained in those affidavits are insufficient to create a genuine issue of material fact.  *Id.*  (internal citations omitted); *Quinn v. Syracuse Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001).

II.     <u>Motion to Strike</u>

At the outset, defendants move to strike portions of plaintiff's submissions in opposition to the motion for summary judgment, identifying certain defects contained in plaintiff's affidavit, exhibits and statements contained in the counterstatement of undisputed material facts.  A court may "strike portions of an affidavit that are not based on the affiant's personal knowledge, contain inadmissible hearsay or make generalized or conclusory statements."  *Hollander v.  American Cyanamid*, 172 F.3d 192, 198 (2d Cir. 1999); *see* Fed. R. Civ. P. 56(e) ("[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."); *Jewell-Rung Agency, Inc. v. Haddad Organization*, 814 F. Supp. 337, 339 (S.D.N.Y. 1993).  Moreover, a "district court's grant of a motion to strike will not be disturbed on appeal unless manifestly erroneous."  *Wechsler v. Hunt Health Systems, Ltd.*, 198 F. Supp. 2d 508, 527 (S.D.N.Y. 2002) (internal citations omitted).

A.      *Plaintiff's Affidavit*

1.      *Conclusory, Speculative or Unsubstantiated Statements*

Defendants argue that certain statements proffered by plaintiff in her affidavit are conclusory, speculative or without personal knowledge.  (Defs.' Mem. in Supp. of Mot. to Strike at 5-7.)  To the extent that plaintiff makes assertions in paragraphs 2 and 3 that Dr. Breitbart was a decisionmaker with respect to making relevant hiring, salary and termination decisions, such assertions shall be disregarded as conclusory.  *Bell-South Telecommunications, Inc. v. W.R. Grace & Co. – Connecticut*, 77 F.3d 603, 615 (2d Cir. 1996) (remarking that "ultimate or conclusory facts and conclusions of law ... cannot be

utilized on a summary judgment motion.") (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 486, 489 (1983)). Furthermore, plaintiff's assertion that "[i]t is to be expected that all of the staff in the clinic would not necessarily know me, because it was a huge place and I fell into a routine of working more closely with the staff who helped me identify and locate patients most effectively" (Perkins Aff. ¶ 5) is the product of conjecture and surmise and therefore shall be stricken from the record. *Brink v. Union Carbide Corp*., 41 F. Supp. 2d 402, 403 (S.D.N.Y. 1997). However, the Court finds paragraphs 6 and 9 of plaintiff's affidavit to be sufficiently specific and based on personal knowledge so as to support her opposition to defendants' motion for summary judgment.

### 2.    *Contradictory Statements*

Defendants also identify certain statements that they claim contradict plaintiff's prior sworn testimony. Specifically, defendants identify the following statements as contradictory: (1) plaintiff's assertion that Dr. Roth never stated any concerns regarding her performance; (2) plaintiff's assertion that Dr. Breitbart, Dr. Rosenfeld, Cotter, Fain and Patterson also served as her supervisors; and (3) plaintiff's assertion regarding her whereabouts on December 13, 2001. (Defs.' Mem. in Supp. of Mot. to Strike at 3-6.)

The Second Circuit has repeatedly stated that "a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Buttry v. General Signal Corp*., 68 F.3d 1488, 1493 (2d Cir. 1995). First, plaintiff's assertion in her affidavit that Dr. Roth never relayed his concerns regarding her performance or accrual rates directly contradicts her testimony. (Perkins

Dep. Tr. at 25-25, 31, 62-65.)  The Court will therefore strike paragraph 7 of plaintiff's affidavit.  Second, plaintiff acknowledges that she previously testified that Dr. Roth was her direct supervisor, but claims that her affidavit merely states that she worked with Drs. Gibson and Kramer under a "team of supervisors and administrators that included Drs. Breitbart, Rosenfeld and Roth" and that "Fain, Cotter and Shawanda Patterson" also were supervisors.  (Perkins Aff. ¶ 4.)  Dr. Perkins' prior testimony does not conflict with her affidavit, but only to the extent that she testified that Dr. Roth was her immediate supervisor *and* that Drs. Breitbart and Rosenfeld were also supervisors on the team. (Perkins Dep. Tr. at 24.)  Moreover, Dr. Breitbart testified that Dr. Roth, Patterson, Cotter and Fain had the authority to give plaintiff raises, discipline her for her job performance and to authorize time-off.  (Breitbart Dep. Tr. at 61-63.)  As such, defendants' motion to strike paragraph 4 is denied.

Third, defendants assert that plaintiff gave varying reasons for where she was during the morning of December 18, 2001 during her deposition and in her affidavit. (Defs.' Mem. in Supp. of Mot. to Strike at 5.)  While defendants focus on plaintiff's assertion that she "went across the street from my work location and began to collect my thoughts and plan for my 4 p.m. meeting with Drs. Holland and Roth."  (Perkins Aff. ¶ 5), Dr. Perkins previously testified that she "was outside for part of the time, so I was at various spots."  (Perkins Dep. Tr. at 160.)  Accordingly, the Court denies defendants' motion to strike paragraph 11 of plaintiff's affidavit.

B.      *Plaintiff's Exhibits A, E and I*

Defendants further seek to strike certain exhibits attached to the Urena Declaration, specifically (1) Exhibit A, a transcript of an undated voicemail message to

plaintiff from "Ms. Greene"; (2) Exhibit E, a transcript of an audio recording of a meeting between Prager, Cotter and plaintiff held on January 2, 2002; and (3) Exhibit I, a copy of plaintiff's handwritten notes with respect to a meeting on November 28, 2001. (Defs.' Mem. in Supp. of Mot. to Strike at 7-8.) Plaintiff asserts, without citing authority, that each of these documents is admissible at trial and therefore properly before the Court on this motion for summary judgment. (Pl.'s Mem. in Opp'n to Mot. to Strike at 4-5.)

Since the transcripts of the undated voicemail message from "Ms. Greene" to plaintiff and the audio recording of the January 2, 2002 meeting between Prager, Cotter and plaintiff were not authenticated, they shall be disregarded. *Dagen v. CFC Group Holdings Ltd.*, No. 00 Civ. 5682 (CBM), 2004 WL 830057, at *3 (S.D.N.Y. April 13, 2004) ("Before a transcript can be introduced to aid jurors in following a recorded conversation, the original recording and transcript must be properly authenticated.")); *Rivera v. Choice Courier Systems, Inc.*, No. 01 Civ. 2096 (CBM), 2004 WL 1444852, at *6 (S.D.N.Y. June 25, 2004) (citing *Cauble v. Mabon Nugent & Co.,* 594 F. Supp. 985, 995 (S.D.N.Y.1984)); *Riley v. Town of Bethlehem*, 44 F. Supp. 2d 451, 460 (N.D.N.Y. 1999) ("A motion to strike will [ ] be granted when it challenges documentary evidence that was submitted in support of or in opposition to a summary judgment motion, but which has not been properly authenticated.") (citing *Dedyo v. Baker Eng'g New York, Inc.,* No. 96 Civ. 7152 (LBS), 1998 WL 9376, *4 (S.D.N.Y. Jan. 13, 1998)).

After having reviewed Exhibit I, the Court need not resolve whether it contains competent evidence since it does not raise any issue of material fact with respect to the resolution of this motion. *See Babiker v. Ross University School of Medicine*, 2000 WL 666342, at *3 n.6 (S.D.N.Y. May 19, 2000). Accordingly, as set forth above, the Court

grants defendants' motion to strike in part and denies the motion in part. The Court shall now turn to the merits of plaintiff's retaliation claims.

II.    Plaintiff's Retaliation Claims

    A.    *HIV Study*

Plaintiff's first retaliation claim asserts that Drs. Breitbart and Rosenfeld unlawfully rejected her for the position on the HIV Study after learning about her complaints to Dr. Gibson regarding (1) her sense of pervasive sex discrimination at the Center, (2) Dr. Breitbart's allegedly sexist comments and (3) Dr. Breitbart's refusal to consider her for the position. (Pl.'s Mem. in Opp'n to Mot. for Summary J. ("Pl.'s Opp'n. Mem.") at 15.) Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. §2000e-2(a)(1). The broad aim of Title VII is "to eliminate discrimination in employment, that is, employees who are similarly situated are not to be treated differently simply because they differ from one another" in aspects such as their gender. *Cosme v. Henderson*, 287 F.3d 152, 157 (2d Cir. 2002). Although plaintiff asserts claims under the New York State Human Rights Law and the New York City Human Rights Law as well as Title VII, "employment discrimination claims under all these statutes are analyzed under the three step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Shain v. Center for Jewish History, Inc*. 2005 WL 2298165, sy 4 (S.D.N.Y. 2005).

The burden-shifting framework articulated in *McDonnell Douglas* sets forth the order and allocution of proof in evaluating retaliation claims asserted under Title VII.

See *McDonnell Douglas*, 411 U.S. at 800-802 (Title VII); *Jetter v. Knothe Corp.*, 324 F.3d 73, 75 (2d Cir. 2003) (analyzing retaliation claim under *McDonnell Douglas* framework).  To establish a *prima facie* case of retaliation, a plaintiff must show that "(1) the employee was engaged in a protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Reed v. A.W. Lawrence & Co. Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996).  A causal connection may be "established either *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (internal citations and quotations omitted).

Assuming that the plaintiff has presented a *prima facie* case, a presumption of discriminatory animus arises, and the burden shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale justifying its adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.  Once the defendant is able to meet that burden, the plaintiff must "demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Defendants argue that plaintiff has failed to establish a *prima facie* case of employment retaliation based on sex discrimination because plaintiff did not suffer an

adverse employment action. (Defs.' Mem. in Supp. of Mot. for Summary J. ("Defs.'

Mem.") at 18.)[5] The Second Circuit has stated that "[a] plaintiff sustains an adverse

employment action if he or she endures a 'materially adverse change' in the terms and

conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640

(2d Cir. 2000) (internal citations omitted). To constitute a "materially adverse change,"

the plaintiff must suffer more than a "mere inconvenience or an alteration of job

responsibilities." *Id.* (internal citations omitted). For example, "[e]mployment actions

that have been deemed sufficiently disadvantageous to constitute an adverse employment

action include 'a termination of employment, a demotion evidenced by a decrease in

wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices … unique to a particular situation."

*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (quoting *Galabya*,

202 F.3d at 640).

In this instance, plaintiff claims that she was denied a request to transfer from her

Project Coordinator position on the Fatigue Study to the Project Coordinator position on

the HIV Study. Plaintiff must thus establish that defendants' "*denial* of her request for a

transfer created a materially significant disadvantage in her working conditions."

*Williams*, 368 F.3d at 128. While there is some dispute as to the precise title and salary

of the position on the HIV Study at the time Dr. Perkins applied, the Court concludes that

at best, the position was purely a lateral move within the organizational structure of the

---

[5] Defendants further respond that neither Dr. Breitbart nor Dr. Rosenfeld, the applicable
decisionmakers, was aware of Dr. Perkins' November 20, 2001 discussion with Dr.
Gibson. (Defs.' Mem. at 18.) Because the Court dismisses this retaliation claim on other
grounds, the Court need not reach this issue.

Center.[6]  Plaintiff has failed to show that the position on the HIV Study would have

afforded her superior wages, benefits or any other objective indicia that the position could

be viewed as a "promotion" from her position at that time on the Fatigue Study.  *See*

*Clemente v. New York State Division of Parole*, No. 01 Civ. 3945 (TPG), 2004 WL

1900300, at *11 (S.D.N.Y. Aug. 24, 2004) (granting summary judgment and dismissing

plaintiff's denial of transfer where position applied for was of equal rank to her current

position).  Although plaintiff speculates that the position would have enabled her to

pursue her interests in HIV and to advance within the Center, "the fact that the employee

views the transfer either positively or negatively does not of itself render the denial or

receipt of the transfer [an] adverse employment action" where the transfer is "truly

lateral."  *Williams*, 368 F.3d at 128 (quoting *Sanchez v. Denver Pub. Sch.*, 164 F,3d 527,

532-33 n.6 (10th Cir. 1998).[7]  These allegations, without more, fail to persuade the Court

that defendants' denial of plaintiff's application for the position on the HIV Study created

a "materially significant disadvantage in her working conditions."  *Id.*  Because plaintiff

has failed to establish that she suffered an adverse employment action, her *prima facie*

---

[6] According to plaintiff, she met with Drs. Breitbart, Roth and Rosenfeld after she had
conveyed her interest in Study position through Dr. Gibson on November 28, 2001.
(Groman Aff., Ex. 19.)  At the meeting, Drs. Breitbart and Rosenfeld allegedly told Dr.
Perkins that they had changed the position to a "lower level position" two days earlier.
(Perkins Dep. Tr. at 117.)  According to defendants, Dr. Breitbart had asked Dr. Gibson
to find a "lower level replacement" for the HIV Study as early as October 7, 2001 since
he no longer needed two Project Coordinators on the HIV Study.   (Defs.' 56.1 ¶ 61, 63;
Gibson Aff. ¶ 10.)

[7] In *Galabya*, the Second Circuit held that a transfer "is an adverse employment action if
it results in a change in responsibilities so significant as to constitute a setback to the
plaintiff's career."  *Galabya*, 202 F.3d at 640.  This emphasis on the objective factors
indicating that a *de facto* demotion has taken place surely applies equally where a *denial*
of transfer is asserted as the basis for a retaliatory claim.

case fails as well. Accordingly, the Court grants defendants' motion for summary judgment with respect to this claim.

B.     *Plaintiff's Termination as Retaliatory Discharge*

Plaintiff's second retaliation claim asserts that defendants terminated her after she lodged a sex discrimination complaint on December 13, 2001. (Pl.'s Opp'n Mem. at 13.)[8] Defendants have not disputed that plaintiff is a member of a protected class, engaged in protected activity by lodging a sex discrimination complaint with Donoghue or suffered an adverse employment action through her termination. Instead, defendants assert that plaintiff has failed to make a *prima facie* showing that (1) any of the purported decisionmakers—e.g., Dr. Roth, Cotter and Prager—were aware of her complaint to Donoghue prior to terminating her; or (2) that they terminated her because of the complaint. (Defs.' Reply Mem. at 22-23.)

The Second Circuit has explicitly stated that "general corporate knowledge that the plaintiff has engaged in a protected activity" is sufficient to satisfy the knowledge requirement. *Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). In other words, the "plaintiff need not show that individual decisionmakers" within the organizations were aware of her protected activity. *Alston v. New York City Transit Authority*, 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1179 (2d Cir. 1996) (finding knowledge requirement met where plaintiff had complained to an officer of the company during an internal investigation). Here, it is

---

[8] Plaintiff argues, without any citation to the record, that she "lodged lawful complaints of gender based discrimination and retaliation with Drs. Roth and Breitbart." (Pl.'s Opp'n Mem. at 13.) To the extent that plaintiff argues that Dr. Roth knew that plaintiff "intended to complain to Dr. Holland about her evaluation with other supervisors present," this assertion is also unsubstantiated by the record.

undisputed that on December 13, 2001 Dr. Perkins met with Donoghue, then acting as

Senior Employee Relations Specialist, and discussed Dr. Breitbart's alleged comments as

well as her sense that she was being treated differently from the men at the Center *prior*

to defendants' initial determination to terminate her on December 18, 2001. (Perkins

Dep. Tr. at 153.)[9] Accordingly, plaintiff has proffered sufficient evidence showing that

the Center was aware of her complaint to Donoghue.[10] *Gordon*, 232 F.3d at 116

("Neither this nor any other circuit has ever held that, to satisfy the knowledge

requirement, anything more is necessary than general corporate knowledge that the

plaintiff has engaged in a protected activity.")

---

[9] Prager subsequently investigated the allegations underlying Dr. Perkins' sex discrimination complaint by interviewing Drs. Breitbart, Roth. Rosenfeld, Kramer and Gibson. (Prager Dep. Tr. at 38.) As such, by January 16, 2002—the date on which Dr. Perkins was ultimately terminated—defendants were certainly aware of her sex discrimination complaint. (Groman Aff., Ex. 43.)

[10] While plaintiff has thus satisfied the knowledge requirement with regard to her retaliatory discharge case against the Center, she has not done so with regard to the defendants Drs. Breitbart and Roth. As "individuals are not subject to liability under Title VII," *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000), the doctors' liability would lie with the claims brought against them for retaliatory discharge under the New York State Human Rights Law and New York City Human Rights Law. *See* First Amended Complaint ¶¶ 89-91, 95-97, *see also, e.g.*, *Mitra v. State Bank of India*, 2005 WL 2143144, at *2-3 (S.D.N.Y. 2005) (noting the circumstances where individual employee or agent liability can exist under both the New York state and city human rights law); *Heinemann v. Howe & Rusling*, 260 F.Supp.2d 592, 595 (W.D.N.Y. 2003) ("Following [the New York Court of Appeals on the matter], courts have held that an individual who has significant supervisory authority, such as the power to hire and fire employees, can be held liable under the HRL"). Here, plaintiff has not pointed to any evidence that Dr. Breitbart and Dr. Roth were individually aware of the complaint she made to Donoghue, as she must in order to establish the second element of her *prima facie* case. *See Rumala v. New York City Transit Authority*, 2005 WL 2076596, at *17 (E.D.N.Y. 2005) ("Although general corporate knowledge of the protected activities is generally enough to satisfy the knowledge requirement, here Plaintiff must prove that [former employee of NYC Transit Authority and co-defendant] had personal knowledge of these events."); *cf Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 138 (2d Cir.1999) (where plaintiff did not establish that municipal official was aware of protected activities, official could not be sued in individual capacity).

Moreover, plaintiff has adduced circumstantial evidence indicating causation to the extent that her complaint on December 13, 2001 was followed closely by her initial termination on December 18, 2001. *Gordon*, 232 F.3d at 117 (remarking that a jury can find "retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities…") Indeed, a "close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." *Treglia v. Town of Manlius*, 313 F.3d 713, 720-21 (2d Cir. 2002) (finding causation where alleged adverse employment action occurred one month after the protected activity); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 2002) (causality established where plaintiff's "discharge came less than two months after she filed a complaint with Green Tree management and just ten days after she filed a complaint with the DHR"). Accordingly, the Court concludes that plaintiff has satisfied her *prima facie* showing of retaliation.

The burden now shifts to defendants to proffer a legitimate, non-retaliatory rationale justifying their decision to terminate plaintiff. *See McDonnell Douglas*, 411 U.S. at 802. Defendants attempt to discharge this burden by asserting that plaintiff engaged in acts of insubordination and job abandonment. (Defs.' Mem. at 24.) Dr. Perkins admits that Dr. Roth expressed his concerns concerning her seemingly laggard accrual rates, his inability to locate her during the day and her absences at meetings where she was expected to attend. (Perkins Dep. Tr. at 144-46; Roth Dep. Tr. at 57-58; Groman Aff., Ex. 20.) It is undisputed that from the summer of 2001 to the fall of 2001, Drs. Roth and Breitbart engaged in numerous conversations regarding Dr. Perkins'

resistance to being accountable for her whereabouts, recurrent latenesses, vacations taken without prior approval, relative lack of productivity regarding patient accrual, limited enthusiasm or self-motivation and repeated inaccessibility during the workday. (Groman Aff., Ex. 19.) Drs. Roth, Breitbart and Perkins met on October 26, 2001 to discuss Dr. Perkins' performance issues as well as her growing dissatisfaction with Dr. Roth's management style. (Perkins Dep. Tr. at 61-66.) It is further undisputed that Drs. Perkins and Roth constantly struggled with Dr. Roth's management style. (Groman Aff., Ex. 19.) Despite Dr. Roth's repeated warnings to Dr. Perkins that she was required to attend her yearly performance review or else face disciplinary action, Dr. Perkins responded that she would not attend. (Defs.' 56.1 ¶ 111; Pl.'s 56.1 ¶ 111.)

In light of all the evidence in the record concerning plaintiff's conduct, the Court concludes that defendants have presented legitimate, non-discriminatory reasons for terminating Dr. Perkins. Indeed, an employer is entitled to terminate an employee perceived to be engaging in insubordinate behavior or job abandonment. *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (affirming district court's decision to grant summary judgment to employer where plaintiff had engaged in the "usurpation of authority" and "contravention of prescribed INS policies…"); *Marlow v. Office of Court Admin. of State of N.Y.*, 820 F. Supp. 753, 757 (S.D.N.Y. 1993) (unresponsive, intolerant, argumentative, disrespectful and verbally combative behavior); *Cutler v. Parfums Givenchy*, No. 96 Civ. 9070 (LAK), 1997 WL 634171, at *2 (S.D.N.Y. Oct. 15, 1997) (repeated refusals to comply with paperwork requirements). Keeping in mind that the burden on defendants to articulate a nondiscriminatory rationale is one of production, not persuasion, *Taylor v. Potter*, No. 99 Civ. 4941 (AJP), 2004 WL 1811423, at *12 (S.D.N.Y. Aug, 16, 2004)

(internal citations omitted), defendants have satisfied their burden of proof at this stage and the presumption of discrimination with respect to plaintiff's claims drops out. *Mario v. P & C Food Markets, Inc*., 313 F.3d 758, 767 (2d Cir. 2002); *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 154 (2d Cir. 2000) (once the defendant proffers a legitimate, nondiscriminatory reason, the defendant "will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.")

Given that defendants have carried their burden in presenting legitimate, non-retaliatory reasons for terminating Dr. Perkins, the burden shifts back to Dr. Perkins to "demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." *Richardson v. New York State of Corrections*, 180 F.3d 426, 443 (2d Cir. 1999) (internal citations omitted). A plaintiff may demonstrate pretext by "the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more...." *Lafond v. General Physics Services Corp*., 50 F.3d 165, 174 (2d Cir. 1995) (internal citations and quotations omitted). Therefore, "unless the employer has come forward with evidence of a dispositive non-retaliatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a [non-retaliatory] reason reflects a question of fact to be resolved by the factfinder after trial." *Id*. (internal citations and quotations omitted).

Plaintiff first asserts that defendants' proffered reasons are pretextual to the extent that Donoghue told her not to attend the yearly performance appraisal meeting with Dr. Roth. (Pl.'s Opp'n Mem. at 18.) The record indicates that on December 7, 2001, Dr. Roth scheduled the yearly performance appraisal meeting with Dr. Perkins for December 13, 2001 at 2:00 p.m. (Defs.' 56.1 ¶ 96; Groman Aff., Ex. 36.) On December 11, 2001, Dr. Perkins subsequently e-mailed Dr. Holland to schedule a meeting to discuss "some matters related to my work here that I think are important." (Groman Aff., Ex. 38.) At the same time, Dr. Perkins unilaterally cancelled the yearly performance appraisal meeting scheduled for December 13, 2001 through Dr. Roth's secretary. (*Id.*, Ex. 37.)

At approximately 5:38 p.m. on December 13, Dr. Roth sent Dr. Perkins an e-mail asking her to "[p]lease make every effort to meet with me and Shawanda to discuss your evaluation." (Groman Aff., Ex. 37.) However, Dr. Perkins did not follow up on Dr. Roth's request to reschedule the meeting, nor did she ever meet with him to discuss her yearly performance appraisal. (Urena Decl., Ex. B; Defs.' 56.1 ¶ 99.) At approximately 6:38 p.m., Dr. Holland responded to Dr. Perkins' e-mail and copied Dr. Roth, suggesting that they meet with Dr. Roth on the following Monday or Tuesday. (Groman Aff., Ex. 38.) At some point, Dr. Holland scheduled the meeting to take place on December 18, 2001 at 4:00 p.m. (Urena Decl., Ex. D.)

Following Dr. Holland's e-mail, Dr. Perkins met with Donoghue on December 13, 2001. (Perkins Dep, Tr. at 153.) During that meeting, Dr. Perkins told Donoghue that she "felt that I was being treated differently than the men and there was discrimination there." (*Id.*) Dr. Perkins relayed Dr. Breitbart's allegedly sexually inappropriate comments to Donoghue and stated that she "wanted to be able to go into

work with the knowledge that I wasn't going to be yelled at, and that it was a professional environment." (*Id.*) Dr. Perkins also asked Donoghue whether "somebody should talk to Dr. Holland about meeting with me alone because of the nature of what I wanted to discuss with her." (*Id*. at 154.) Dr. Perkins further alleges that she told Donoghue that she was "concerned about the upcoming evaluation" because she "didn't know whether there would be bias in the evaluation because I was already being retaliated against and I had been yelled at and humiliated." (*Id.*) According to Dr. Perkins, Donoghue said:

> [W]ell, go ahead, *don't have the evaluation meeting*, have the meeting with Dr. Holland as you've already begun to set up here. *And she said not have to the evaluation meeting* and that having an evaluation with somebody who was one of the people who you were complaining about wasn't the best way to go about doing it. So therefore, to make sure, go ahead and meet with Dr. Holland.

(*Id*.) (emphasis added). Dr. Perkins testified that she did not believe that the meeting with Dr. Holland was "in lieu of" the yearly performance appraisal meeting with Dr. Roth. (Perkins Dep. Tr. at 159.)

Donoghue has not explicitly denied that she told Dr. Perkins not to attend a yearly performance appraisal meeting with Dr. Roth, although it is worth noting that, at the time of the Donoghue-Perkins meeting on December 13, no yearly performance appraisal meeting had in fact been scheduled. Rather, Donoghue testified that she "didn't understand the relationship with [Dr. Perkins'] meeting with Dr. Holland and then things somewhat began to fall in place…. I told her that I thought she should agree to meet with Dr. Roth and Dr. Holland." (Donoghue Dep. Tr. at 43-44.) Indeed, there is no dispute that Donoghue encouraged plaintiff to attend the second meeting involving *both* Drs. Holland and Roth. (Donoghue Dep. Tr. at 35; Perkins Dep. Tr. at 155.)

On December 17, 2001, Dr. Roth again e-mailed Dr. Perkins at approximately 2:12 p.m., advising that she was directed to appear for a mandatory meeting on December 18, 2001 at 9:30 a.m. (Groman Aff., Ex. 39; Perkins Dep. Tr. at 156.) Dr. Perkins refused to attend the meeting. Dr. Roth's e-mail stated that if Dr. Perkins did not attend the meeting, the Center would "take appropriate next steps, including disciplinary action." (Defs.' 56.1 ¶ 111; Pl.'s 56.1 ¶ 111.) At approximately 2:59 p.m. that day, Dr. Perkins responded to Dr. Roth's e-mail, writing that: "I am sorry, I am unable to attend the meeting tomorrow morning. My follow-up concerning this issue is included in my arranging a meeting with Dr. Holland, which I initiated last week." (Groman Aff., Ex. 39.) Dr. Roth forwarded Dr. Perkins' e-mail to Cotter, who was then informed by Prager that Dr. Perkins could be terminated for job abandonment and insubordination if she failed to attend the meeting. (Defs.' 56.1 ¶¶ 107, 108, 114.)

After Dr. Perkins failed to attend the December 18, 2001 meeting with Dr. Roth (Defs.' 56.1 ¶ 116), Dr. Roth, Cotter and Fain asked Dr. Holland if they "could use her 4pm meeting time to speak with Stefanie" because she had "refused to meet with [them] to discuss her performance appraisal." (Urena Decl., Ex. D.) Upon encountering Dr. Perkins outside Dr. Holland's office at 4:00 p.m., they explained to her that "it was inappropriate for her to circumvent her appraisal with her supervisor and to meet with Dr. Holland directly" (*id.*), even though the e-mail from Dr. Holland indicates that Dr. Holland suggested that they meet together with Dr. Roth. (Groman Aff., Ex. 38.) According to Dr. Perkins, Dr. Roth said, "Dr. Holland is not going to be meeting with you today, since you set that up as … a substitute for your evaluation meeting," to which Dr. Perkins responded, "[O]h no, that is not what happened." (Perkins Dep. Tr. at 165.)

Dr. Roth ultimately fired Dr. Perkins, telling her,"[Y]ou're being fired for job insubordination and abandonment." (Perkins Aff. ¶ 16.) According to Dr. Perkins, Cotter said that the Dr. Perkins' failure to attend the yearly performance appraisal meeting had played a role in her termination. (Perkins Aff. ¶ 17.) The termination notice Cotter filled out also states that plaintiff "refused to meet at 9:30 a.m. and was not in clinic now or at her office until 12:40 p.m…. Stefanie is being dismissed because of job abandonment and insubordination." (Groman Aff., Ex. 40.)

Plaintiff's allegations regarding the circumstances surrounding her termination raise a genuine issue of material fact as to whether defendants' proffered non-retaliatory reasons for their termination decision were pretextual. If credited, plaintiff's testimony indicates she followed Donoghue's instruction not to attend *any* yearly performance appraisal meeting scheduled with Dr. Roth, only to have defendants later claim that her failure to attend the yearly performance appraisal meeting scheduled for December 18, 2001 resulted in her termination.[11] While at the time Donoghue allegedly made this statement, no yearly performance appraisal meeting had been scheduled with Dr. Roth, a rational factfinder could find that Dr. Perkins simply followed Donoghue's vague instructions in refusing to attend the yearly performance appraisal meeting with Dr. Roth. As such, plaintiff has raised an issue of material fact that allows her retaliation claim to survive—albeit barely—beyond the summary judgment stage.[12] Since it is not the

---

[11] Although plaintiff claims that Dr. Roth knew that plaintiff "intended to complain to Dr. Holland about her evaluation with other supervisors present and Plaintiff's other gender based discrimination and retaliation claims," this argument is unsupported by the record and shall be disregarded. *See Patterson*, 375 F.3d at 219.

[12] The Court is otherwise unconvinced by plaintiff's other attempts to raise genuine issues of material fact. Specifically, plaintiff first argues that after Dr. Roth terminated Dr. Perkins, Cotter changed the termination to a suspension without pay, upon

province of this Court to resolve factual disputes or make credibility determinations, the Court denies summary judgment with respect to this claim.

III.    Conclusion

The Court grants defendants' motion for summary judgment [44] in part, and denies the motion in part. Defendants' motion to strike [56] is granted in part and denied in part.

SO ORDERED

Dated: New York, New York
September 30, 2005

Richard J. Holwell
United States District Judge

---

instructions from Prager, because Dr. Perkins had mentioned the complaint she had made to Donoghue. (Urena Decl., Ex. D.) However, the Court fails to discern how such action is indicative of retaliation since if anything, defendants altered an adverse employment action—Dr. Perkins' termination—in Dr. Perkins' favor upon learning of her complaint.

Second, plaintiff appears to assert, without citation to the record, that defendants' concerns regarding Dr. Perkins' performance were pretextual since Dr. Roth never communicated those issues to Dr. Perkins and in fact recommended her for a salary increase. (Pl.'s Opp'n Mem. at 17.) The record certainly belies that claim, since it is undisputed that Drs. Perkins and Roth engaged in several conversations regarding her performance issues. (Perkins Dep. Tr. at 24-27, 57-58, 145-46.)